On May 20, 1946, Phillip Asevedo secured from First National Life Insurance Company a policy of life insurance commonly known as a "Travel" or "Pedestrian" policy. Under it defendant insurance company agreed that it would pay to the named beneficiary, Annie Asevedo, the wife of the insured, $1,000 should the insured meet death under certain conditions which are specifically set forth in the policy as follows:
"If the insured shall by being struck by actually coming in physical contact with the vehicle itself and not by coming in contact with some object loaded on or attached thereto, or some object struck and propelled against the person by said vehicle, which is being propelled by steam, cable, electricity, naphtha, gasoline, horse, compressed air or liquid power, while the insured is walking or standing on a public highway, * * *."
In the policy it is provided that the term "Public Highway," "as used in this policy shall mean the traveled and improved portion of the Highway, and shall not be construed to include any portion of railroad or interurban railway yards, station ground or right of way, except where crossed by a public thoroughfare dedicated to and used by the public for automobile or horse vehicle traffic, and shall not include any river, stream, or waterway, or Public Highway, which although dedicated to the public has not in fact been opened to and is being used by the public generally for vehicular traffic;"
The policy contains certain other stipulations concerning other payments in other contingencies, but we are not concerned with any of them.
On June 30, 1947, at about 9:30 or 10 o'clock at night, in the settlement known as Violet, Louisiana, the insured was struck by an automobile and he died a short time later as the result of the injuries so sustained. His widow, the designated beneficiary, brought this suit in the Twenty-fifth Judicial District Court for the Parish of St. Bernard claiming the face amount of the policy, to-wit $1,000, and alleging that the accident had occurred while her *Page 614 
husband, the insured, was "standing or walking on State of Louisiana Highway No. 1 * * *."
The defendant admitted the issuance of the policy and that it was in full force at the time of the alleged occurrence, but it denied all of the allegations to the effect that the insured had been struck while standing or walking on the highway.
There was judgment below in favor of plaintiff for the full amount of the policy, and defendant has appealed.
That there was such an accident is not actually in dispute and that Asevedo died as a result is conclusively shown, and the only dispute arises over the question whether, when Asevedo was struck, he was "on a public highway" within the contemplation of the policy provision.
Counsel for defendant seem to assume that the condition of the policy, which requires that the insured be on a public highway in order that there be recovery, should be so narrowly construed that recovery should be denied, unless it appears from the evidence that the insured was actually on the concrete portion of the highway and not on the shoulder or any other part thereof however near to the concrete portion he may have been.
Counsel for plaintiff while not conceding that the policy condition requires that the insured should be on the paved or concrete portion itself, nevertheless directs his efforts at an attempt to show that Asevedo actually was on the concrete strip when he was struck.
There can be no doubt at all that the witnesses produced by the plaintiff, and in fact some produced on behalf of defendant, were most anxious to make certain that plaintiff should recover, and their efforts to bring about this result were so obvious that it is extremely doubtful whether any of them were telling the actual truth concerning the location of the spot at which Asevedo was struck.
At the scene of the accident the main highway consists of a concrete slab about 18 feet in width which crosses the highway bridge over the Violet or Borgnemouth Canal. On the upper side of this bridge and alongside the concrete there is a widening which is paved with clam shells and a side lane comes into the highway at a right angle. This shelled surface extends for some 15 or 20 feet from the concrete, and at a point probably 100 feet or more from the bridge there is a grass plot which parallels the slab. This grass plot at its nearest point seems to be 8 or 10 feet from the concrete.
It appears from the record that Asevedo and some twelve or fifteen, or possibly eighteen, other persons were attempting to push an automobile truck from this side road, or from this shelled portion, to the concrete slab of the highway. The battery of this truck was "dead" and these persons were back of it and on the sides and were pushing it in an up-river direction. They had reached, or were about to reach, the concrete part of the main highway just as an automobile, driven by Wilson Gutierrez, approached from the rear of the truck which was being pushed, and as Wilson Gutierrez crossed the bridge he suddenly noticed in front of him this crowd of people who were pushing that truck. He says that he realized that he could not stop and he therefore, violently swerved his car to the right in an effort to avoid the accident, but that he could not avoid all of the people and that he struck Asevedo, who apparently was the last person on the righthand side of the group which was pushing the stalled truck.
When Wilson Gutierrez was asked: "Where was Mr. Asevedo at the time?" he answered: "Just off the highway." Counsel then asked: "On or off?" And he repeated "Off the highway when I hit him." Later he seemed to realize that he had given evidence which might be detrimental to plaintiff's case and when shown certain photographs, in an effort to make certain that his testimony would indicate that Asevedo was on the concrete, he marked a spot on the photograph as the point where Asevedo was standing and he said that he was certain that he had been on the concrete because after the accident, "his hand was on the highway."
Lionel Gutierrez, brother of Wilson, was in the car with Wilson. He said that Wilson "swerved off the road * * *" and "happened to hit a poor unfortunate with *Page 615 
the righthand fender * * *." He too realized that this testimony might damage plaintiff's case and then said that it was the lefthand fender which had struck Asevedo, and that "this poor man was standing about two or one and one-half feet on the pavement when we struck him * * *." He too insisted that after the accident Asevedo "was laying with his hand and a part of his shoulder on the highway. * * *"
The most obvious efforts to color the facts so as to assist the plaintiff were those made by four young boys, who apparently had formed part of the group pushing the truck on the highway. These four boys were Eugene Perez, Jerry Rodriguez, Cola Long and Glenn Nunez.
The record shows that an investigator for the defendant insurance company went into St. Bernard Parish shortly after the accident and talked to the various witnesses, including these four boys. And it shows that these boys were apparently interviewed at the same time and that this investigator, J. W. Cleary, made notes as to what they had said. Many months later, when it became apparent that the case could not be amicably adjusted, Cleary wrote up statements for these boys to sign, and all of these statements he wrote in identically the same words. When one of the attorneys for the defendant company was preparing the case for trial, he himself went into the Parish of St. Bernard to talk to the witnesses before putting them on the witness stand, and he talked to three of these boys. On the day of the trial, when these boys were placed on the stand by the defendant, instead of giving evidence which would support the contention of the defendant that Asevedo had not been on the concrete when he was struck, each one made the statement that he was certain that Asevedo had been on the concrete and that after the accident his body was lying so that his hand or his arm extended over the concrete. The attorney who had talked to three of the boys, took the stand and testified that each one of the boys had corroborated the written statement which he had signed and in which each had said that when Asevedo was struck, he was not on the highway. Each of the three boys who had been interviewed by counsel admitted that the attorney had talked to him, but each made some remarkably improbable statement about his reason for signing the written statement. One said that though he was a grammar school student, he could barely read and, therefore, had not read and did not know what was in the written statement, and yet when the statement was handed to him, the record shows that he read it with little or no difficulty. Another one of these boys said that he had signed the statement, but that he did not read it because he had thought that it was a beer permit which was being issued to the beer parlor in which he was when he was being interviewed. The third of these boys was asked by the attorney if he had not taken him in his car to the scene of the accident so that he might point out the spot at which Asevedo was standing when struck, and this witness admitted that this attorney had talked to him and that he had taken him into his automobile, but he denied that he had been taken to the scene and said that the attorney merely wanted to take him for a ride. The father of one of the boys had signed as a witness to each of the signatures.
We are thoroughly convinced from the testimony of these four boys that their stories are entirely unworthy of belief.
But our conclusion from a reading of the entire record is that at the time Asevedo was struck, while he was not on the concrete portion of the highway, he was only a few feet away from it and was on the gravel portion either of the shoulder or of that extension of the shoulder which was used by vehicles in going to and from between the highway, the side road, a garage nearby, and a beer parlor a little further along.
It is shown that the State Department of Highways maintains not only the concrete part of the highway, but a strip ten feet wide which is maintained as a shoulder on that side of the road on which Asevedo was when he was struck.
And it is our belief that the policy should not be so narrowly interpreted as to afford coverage only where the person struck is on the concrete portion of such a highway. *Page 616 
We are impressed with the fact that if defendant's contention is to be accepted, then under such circumstances there can be recovery under such a policy only if the insured is doing the very thing which defendant would not want done. In other words, the insured must be walking or standing not on the shoulder, but on the concrete portion itself. In many states it is illegal to walk on the paved portion of such a highway if a shoulder is available, and in all states it is dangerous to do so. Therefore, if we interpret this policy condition as defendant would interpret it, we would require that in order that there be coverage, the insured must be either violating the law in certain states or must be following the very dangerous practice of walking on the paved portion instead of on the shoulder.
We do not feel that it is necessary to hold that any part of such an adjoining shelled portion of a shoulder or any part of any adjoining parking space should always be considered as a part of the highway for the purpose of determining whether such a policy has application, but we do hold that, under the facts shown here, the particular point at which Asevedo was when he was struck should be considered as a part of the highway, since he obviously was very close to the concrete portion and was either on that part of the shoulder which was maintained by the State Highway Department, or was within a few feet of that shoulder and on an indistinguishable part of the shelled portion adjacent thereto.
Neither counsel for defendant nor counsel for plaintiff have cited any authorities which we deem applicable, but in Galloway v. Wyatt Metal Boiler Works, 189 La. 837, 181 So. 187, 189, our Supreme Court discussed the meaning of the term "public highway" as used in Act 86 of 1928, as amended by Act 184 of 1932, which statute as amended provides for civil process against nonresidents in cases arising out of the operation by nonresidents of motor vehicles on public highways. There the accident which was involved "occurred on a sandy road which has been in public use for many years." The Supreme Court, in discussing the term "public highway," said the following:
"We think that the term 'public highways' as employed in the body of Act No. 86 of 1928, as amended, is broad enough in its ordinary acceptation to include every way for travel by persons on foot or with vehicles which the public has the right to use either conditionally or unconditionally. The term is employed in the statute as synonymous with the term 'public roads.' The very nature of a highway presupposes that it is open to the public, i. e., a 'highway' is a 'public road.' Therefore, the term 'public highway' is a tautological expression meaning simply 'public road.' 29 C.J. 367.
"The general law relative to the nature and use of highways is stated in Corpus Juris, vol. 29, at page 366, as follows, viz:
" 'Highways are public ways as contradistinguished from private ways. The distinguishing mark of a highway is that it must be opened generally to public use, as expressed in the English books, "common to all the king's subjects," although it is the right to travel upon a highway by all the world and not the exercise of the right which makes the highway. Its character is not determined by the number of persons who actually use it for a passage; if it is open, it is immaterial that but few individuals are in a position to make use of it, or that one person is most benefited by it; and its character as a highway is not affected even by the fact that it furnishes access or egress to but a single property owner. The term "public highway" is a tautological expression, since a highway is a passage, road or street, which every citizen has a right to use, and is therefore, necessarily public. * * *' "
Under our Civil Code, article 705, a road becomes a public road if it is made use of as a highway, although it is provided and kept in condition by the owners of adjacent properties. Therefore, even though the accident may have occurred in that graveled area which was adjacent to that part of the highway which was maintained by the Department of Highways, it, nevertheless, was a spot which, under Article 705 *Page 617 
of our Code, would be designated as a public road.
As we have said, our view is that at the time Asevedo was struck he was in a spot which, in the contemplation of the policy, was on a public highway.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.